George **RAMIREZ**, Plaintiff,

v.

Daniel A. **SENKOWSKI**, Superintendent of Clinton Correctional Facility, Defendant.

No. CV 96–2090.

United States District Court, E.D. New York.

May 20, 1998.

Legal Aid Society (Frank J. Loss, Robert S. Dean and Daniel L. Greenberg, of counsel), New York City, for Petitioner.

Charles J. Hynes, Kings· County District Attorney (Roseann B. MacKechnie, Amy Appelbaum, Luisa K. Hagemeier, Asst. Dist. Attys., of counsel), Brooklyn, NY, for Respondent.

NICKERSON, District Judge.

Petitioner George Ramirez, brought this proceeding under 28 U.S.C. § 2254 seeking a writ of *habeas corpus*.

In 1992 Ramirez was charged in a Kings County, New York indictment with Murder in the Second Degree, New York Penal Law § 125.25[1], Criminal Possession of a Weapon in the Second Degree, New York Penal Law § 265.03, and Criminal Possession of a Weapon in the Third Degree, New York Penal Law § 265.02[4]. He is now in Clinton Correctional Facility.

Ramirez's first trial before Supreme Court Justice Joel Goldberg resulted in a mistrial because the jury was unable to reach a verdict. He was found guilty at his second jury trial before Justice Goldberg of Manslaughter in the First Degree and Criminal Possession of a Weapon in the Second Degree.

On December 15, 1993, Justice Goldberg sentenced Ramirez to concurrent terms of imprisonment of eleven to twenty-two years for manslaughter and seven and one-half to fifteen years for possession of a weapon. On January 22, 1996, the Appellate Division affirmed. *People v. Ramirez*, 223 A.D.2d 656, 636 N.Y.S.2d 847 (2d Dep't 1996). The presiding Justice Cornelius J. O'Brien dissented. An application for leave to appeal to the Court of Appeal was denied on March 14, 1996. *People v. Ramirez*, 87 N.Y.2d 1023, 644 N.Y.S.2d 157, 666 N.E.2d 1071 (1996).

I

The petition, filed in this Court by the Legal Aid Society on April 29, 1996, claims that petitioner was denied his due process right under the Fourteenth Amendment to a fundamentally fair trial because Justice Goldberg gave the jury an *Allen* charge, *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), suggesting, based on the judge's speculation, that some jurors might be improperly basing their verdict on racial considerations. In affirming the majority in the Appellate Division stated that "while the charge in this case was unusually and unnecessarily lengthy, a review of the charge as a whole demonstrates that it was essentially neutral, directed at the jurors in general, and did not coerce them to reach a verdict or to achieve a specific result." 223 A.D.2d at 656, 636 N.Y.S.2d at 847–48.

Presiding Justice O'Brien dissented, stating that although the *Allen* charge instructed the jurors "not to give up their conscientiously held beliefs", it "coerced conformity among the jurors and shamed them into reaching a verdict." 223 A.D.2d at 659, 636 N.Y.S.2d at 849.

II

The same prosecutor and defense ·attorney appeared in both trials. The prosecutor, Jeff Kern, is a white male. The defense attorney, Julie Clark, is a black female. The judge presumably was white. The record is not clear as to the racial composition of the jury. But the defense counsel's comments at the trial, not disputed by the judge or the prosecutor, indicate that at least one juror was Black and one Hispanic.

III

The evidence offered by the prosecutor showed the following. On August 16, 1992, at about 5:30 p.m., George Ortega saw two Hispanic men and one Black man, all unknown to him, having a conversation in front of 130 Third Avenue in Brooklyn, near the Wyckoff Projects. He heard two shots, and

then saw one of the Hispanic men, a light skinned man with a small mustache, shoot the Black man, who also had a gun. The Hispanic man than ran towards Third Avenue and Wyckoff Street, past Ortega. He was holding a silver revolver in his hand, and wearing what "[l]ooked like a silver rain coat or windbreaker" with a hood and blue jeans.

The other Hispanic man, later identified as Hector Caraballo, was moving away toward the corner of a building. The Black man, later identified as Wilson Rodriguez, followed him and shot him repeatedly. Hector Caraballo then fell over a fence and collapsed in front of a building.

Ortega went to see the body of Caraballo, whom he had not seen with a gun earlier. Nor did Ortega see any gun nearby. During the entire incident, Ortega saw only two guns, the one Rodriguez held and the one the first Hispanic man held.

On the same afternoon Joseph Alicea was waiting for friends in front of 130 Third Avenue when he saw three men, Rodriguez and the two Hispanic men. Alicea recognized petitioner as one of the Hispanic men and identified him as wearing a hooded green jacket. Alicea saw a struggle between Rodriguez and petitioner, who pointed a silver revolver at Rodriguez and shot him several times. Alicea then ran toward Third Avenue, and looking back saw petitioner continue to shoot and then run toward Wyckoff Street while Rodriguez was lying on the ground in front of 130 Third Avenue. When Alicea reached the corner of Third Avenue and Wyckoff Street, he dialed 911 and reported the shooting. He then went back to 130 Third Avenue and saw Caraballo lying in the bushes.

When police arrived at the scene, Caraballo was dead, and Rodriguez had what appeared to be a bullet hole in his chest. The emergency medical service then treated Rodriguez at the scene, and took him to the hospital where he died.

Although the police remained at the scene for about five hours and made a preliminary search for weapons, they found none on Rodriguez or Caraballo and none in the area. Later that afternoon, detective Ward from the Crime Scene Unit found in Rodriguez's clothing ten nine-millimeter rounds, a black leather pouch, two hundred and three dollars and twenty-one cents in U.S. currency, a beeper, eighty glassine envelopes containing what appeared to be heroin, a yellow ring, and a gold chain. The Unit also recovered four nine-millimeter shell casings in front of 130 Third Avenue lying between the bodies of Rodriguez and Caraballo and a spent round from Caraballo's jacket.

On the same day detectives went to Methodist Hospital and spoke to petitioner, who was conscious, alert, and appeared to be scared. He had been shot once in the shoulder. He told the detectives that his wife gave him fifteen dollars and a shopping list, that he was going to the store to buy groceries, and that as he was leaving the store, two men tried to rob him and shot him. He said he could not provide a description of the two because it had been raining and "he really didn't see" them. While speaking to petitioner the detectives noticed next to the stretcher on which he was lying a pile of wet and bloody clothes, a green hooded jacket, a pair of jeans, a shirt, and sneakers. The detectives searched for the alleged fifteen dollars and a grocery list, but found neither.

Detectives checked the police computer network for reports of street crimes and found no reports of such crimes in the vicinity of 36th Street and Fourth Avenue, where the grocery store was located.

The next day detectives again talked to petitioner and asked how he got shot. Petitioner said he had lied in the previous interview but wished now to tell the truth. Petitioner then told the detectives that on the way to the grocery store he changed his mind and went to visit his friend Hector Caraballo. They were together until about 4:00 p.m., when they decided to visit two other friends. According to petitioner, as they walked past the Wyckoff projects, they saw three men standing outside the building. One of them said something in Spanish that sounded like "that's him" or "Yo, that's him." Caraballo then said, "I had a prior beef with them," and "Let's jet," meaning let's leave.

One of the three men, who had dark skin, pulled a gun from his waistband and began

shooting at them. When petitioner "felt" that he had been shot, he turned and ran, and got a car service to take him to Methodist Hospital.

Petitioner also told the detectives that while he was in the hospital, his wife told him that Hector Caraballo had died. Detectives thereafter confirmed with a car service company that it had taken petitioner to the hospital.

On September 8, 1992, detectives arrested petitioner for the murder of Rodriguez. They advised him of his *Miranda* rights. He said he understood his rights and agreed to answer questions. He then made a statement, later reduced to a writing which he signed.

In the statement petitioner repeated the story he had given the day after the incident but added that he took the train to Caraballo's house after going to the store. He also stated that he and Caraballo met a friend of Caraballo's named Willie with whom Caraballo had had a disagreement over some money, which Willie then refused to pay him. Because of this, Caraballo pulled out a gun and shot Willie.

Petitioner also said that when he and Caraballo went to look for petitioner's friend, there were two men standing in front of the building, not three as he had previously stated. Petitioner said he heard one of them say to the other, "Yo, that's him", and then, one of the two men, the tall, dark-skinned one, pulled out a gun and shot petitioner. This time petitioner stated that Caraballo also had a gun and got mad after petitioner was shot, and shot the dark-skinned man.

Later that day, Alicea identified petitioner in a line-up as someone he recognized from the day of the shooting. A ballistics expert testified that all the bullets recovered from the scene, including two from Caraballo's body and one from petitioner's body, were nine-millimeter bullets, that the four nine-millimeter discharged shells were all fired by the same gun, and four twenty-two-caliber bullets received from the morgue were fired from a different gun.

Petitioner offered no evidence at the trial.

## IV

The jury, having heard the judge's initial charge, retired to deliberate at 11:50 A.M. on November 22, 1993. At 2:20 P.M. the jury asked for the photographs of the line-up, petitioner's grand jury testimony, a diagram of the street in question, and also asked to hear a 911 tape. After receiving the exhibits and listening to the tape the jury retired to continue to deliberate at about 3:00 p.m.

The jury asked at 3:45 for the medical examiner's diagram and for a read back of Alicea's testimony. After the reading the jury retired at 4:35 P.M. At 6:15 P.M. the judge sent them out for dinner and the night at a hotel.

On November 23, 1993 the jury returned to deliberate at 9:30 A.M. In about an hour they asked to hear certain direct testimony of Ortega and for petitioner's written statement. At 11:10 they heard the read-back and retired to deliberate. At 11:50 the jury asked to hear further testimony by Ortega concerning his identification of what the "shooter" was wearing, and as to whether he could identify the shooter in court. They left the courtroom at 12:35 P.M.

Within ten minutes the jury sent a note reading: "We are a hung jury, we cannot agree." The judge gave a charge urging the jury to continue to deliberate, to listen to each other, to refrain from getting emotional, and to be fair and objective. At 1:05 P.M. the jury retired to deliberate.

At 3:05 P.M. the jury sent another note reading: "At this point we find it impossible to come to agreement. Any further deliberations we all felt are useless." After consulting with counsel the court gave a further charge, telling the jury they had not deliberated long enough and telling them not to be stubborn, to discuss the case rationally and "in an unemotional way."

The jury went out for dinner at 5:30 P.M. and returned to continue deliberating at 7:45 P.M. At 9:05 P.M. the jury sent another note saying that "after discussing the case, with calm and open minds, we the jury could not come to an agreement at this time." The judge, telling the jury that he was "not satis-

fied that you can't reach a verdict on this case", sent them to a hotel for the night.

On the next day, November 24, 1993, the judge told the attorneys that in addition to the usual *Allen* charge he would tell the jury, among other things, that they should not let "personal feelings for or against the attorneys", or "feelings of sympathy for the victim or the defendant", or "any racial considerations that may be in the mind of any one of the jurors", influence their verdict.

Ms. Clark objected, saying that there was "nothing about race in the case", that neither attorney brought race into the case, and that the judge was "trying to speculate" as to what the jury was doing. The judge said, "I am speculating as to what the problem might be" with the jury, and said he had a duty to be of assistance in resolving the problem. When Ms. Clark asked the judge, "what does race have to do with this case?" the judge responded, "nothing," but "in some jurors' minds it may; I have no idea."

The prosecutor reminded the court that it was the day before Thanksgiving, and the closer it became to Thanksgiving "the more potential there is for a verdict to be squeezed" from the jurors if they had travel plans. The judge said that any juror who had such plans could so advise him and that he would not at that time say anything to the jury on the subject. The court said it realized it was not giving a "standard" *Allen* charge but that it was "appropriate" and not "coercive."

The theme of the charge was that while no juror should set aside a belief conscientiously held based on the law and the evidence or surrender an honest conviction as to the weight or effect of the evidence, each juror should ask whether he or she is acting reasonably or getting sidetracked in the emotions of the case.

Ms. Clark particularly objected to the following parts of the charge.

The judge told the jury, among other things, that it should use logic rather than emotion in reaching its decision:

For example, we buy a particular automobile, even a car we can't afford, not because we're getting the best deal or getting the best car, but because we like the salesman. Now, that isn't careful, calm reasoning, but we do that, we do that. Or even sometimes we fall in love because we like the other person's perfume or cologne. That doesn't make any sense at all. I'm not going to say anything more about it, but you know what I mean. But sometimes we make important decisions not based on the facts and the evidence and the weighing and the logic, and even sometimes we vote for political candidates not based on political merits but on the color of a candidate's skin. Again, that has nothing to do with the merits but sometimes we do these things.

The judge also told the jurors not to let their feelings about the attorneys influence their verdict. The charge included the following analogy about Abraham Lincoln:

Now, Abraham Lincoln was a lawyer before he was a president, and he hardly ever lost a case, and it doesn't matter if he was a Defense Attorney, it doesn't matter if he was a prosecutor, it didn't matter if he was representing the railroad against the small farmer, and it didn't matter if he was representing the small farmer against the railroad. He won his cases. He won his cases, not because the law and the evidence were always on his side; he won his cases because juries trusted Abe Lincoln, because it's natural sometimes for juries not to really think about the evidence in the case but to start thinking about the lawyer.

In the part of the charge telling the jury not to let feelings of sympathy interfere with the deliberations, the judge included the following admonition:

It's a serious case; you may feel sorry for the victim. But if proof [sic] was not proved beyond a reasonable doubt, the verdict must be not guilty, even if you feel sorry for the victim.

On the other hand, you may not feel sorry for the victim. You may feel that he got what he deserved; but that's for God to decide, okay? Instead you may feel sorry for the Defendant because he was shot, and his friend Shorty [Caraballo] was

killed during this incident. If that's the case, you have to put that feeling aside also, because you all promised you would decide this case without any feelings of sympathy.

The court also told the jury not to render their verdict based on race:

And finally, and this is just a fact of life here, and if I'm off-base here and it doesn't apply I apologize if I am offending anybody, but some people make decisions based on race. Again, if it's not playing a role in anybody's decision here, I apologize for bringing it up. But if this is on anyone's mind, if the race of the victim, the race of the witnesses or the race of the lawyers, my race, is influencing any one of you, you have a duty to try to put those feelings aside and bring in a verdict based on the evidence in the case. Because any concept of justice in a fair trial doesn't include factoring in what the race of anybody is.

Again, if it's not playing a part in anybody's deliberations, I apologize. If I'm offending you by bringing this up, I apologize, but if it is playing a part in anyone's thinking, please try to put the feeling aside and reach a verdict based on the law and the evidence.

The judge's concluding remarks were as follows:

That concludes what I have to say. Again, I remind you that I'm not trying to coerce a verdict out of you. I'm not saying that anyone should give up a conscientiously held belief based on the law and the evidence in the case. I urge you to continue to deliberate, give your reasons based on the law and the evidence to the other jurors, listen to what the other jurors have to say. Try to change the minds of the people who disagree with you. Keep an open mind; maybe they'll convince you to change your mind. And if you have any of these improper considerations in your mind, either consciously or unconsciously, or a reluctance to follow the law that I've instructed you on, feelings about the lawyers or feelings of sympathy or the other issues that I mentioned, please try to put it aside, because the twelve people who are

going to try this case after you are not better than you you are, and I'm sure that if you give it one more try, everyone will appreciate it.

After the jury had left the courtroom, defense counsel moved for a mistrial. She told the court:

I believe that the Court's tenor in its instructions was outrageous. The Court went into areas that this jury is not even speculating it about [sic]. The Court is speculating and making itself as a trier of fact.

\*     \*     \*     \*     \*     \*

This Court's charge regarding race is outrageous. And the Court talks to the jury about it being offended? I'm offended, sitting in this trial, having the Court bring racial issues into this case which have nothing to do with this case, which maybe the Court is saying to maybe the black or Hispanic jurors on the jury that maybe you're sympathetic to the Defense because of the racial deposition [sic] of the Defendant and the attorney. I am offended by the Court's actions and believe it can't be cured.

I believe the Court has to grand a mistrial because of it's inappropriate remarks.

The Judge responded:

If I've offended you or your client, I apologize. However, I felt the remarks were not out of line, and the way I instructed the jury was not based on any assumption that I have that race was playing a part.

However, it is, as I said, a fact of life that race does play a part in some people's decision-making, and I asked those jurors who may have had such considerations as possibly playing a part in their decision-making process not to do so. I felt it was proper. You're correct, I was speculating, I had no basis on which to make that speculation, to make that general assumption that some juror might have sympathy for the victim or the defendant in this case, or for Shorty [Caraballo] in this case, for that matter. I brought up considerations of sympathy, I bought up their duty to follow the law and the fundamental legal

principles, because I felt that the jury had to be reminded of that.

And as far as whether or not the jury had a like or dislike for a particular lawyer, that issue is a standard part of any jury charge. What I did was repeat it again. It was speculation as to whether or not that was influencing the jury, but since it is a part of a standard jury charge, it is not part of a standard jury charge without reason, because it is felt that indeed such feelings may possibly interfere with jurors' judgment about the case, and I felt that the way I instructed them was neutral. I didn't indicate that their like or dislike might have been for any particular attorney.

The judge denied the motion for a mistrial.

One hour after the court finished giving its amended *Allen* charge, the jury sent a note saying that it had reached a verdict. The jury found petitioner not guilty of second-degree murder, but guilty of first-degree manslaughter and of second-degree criminal possession of a weapon.

On the day of sentence Ms. Clark moved to set aside the verdict based on, among other grounds, that the court's final charge to the jury interjected race into the trial although there was no indication from the jury that they were having problems deciding the case because of any issues of race. The judge denied the motion.

The judge observed that the overwhelming evidence showed that petitioner had shot the victim and that it was not hard to guess whey it took so long for the jury to convict. In the judge's opinion it was because the victim was found with eighty glassines of heroin and his own gun, which he used to shoot petitioner and to kill petitioner's unarmed companion. The judge concluded that the jury had very little sympathy for the deceased as contrasted with the fine-looking family of petitioner and that it was no wonder that perhaps jury reached for reasonable doubt "where, objectively, there was none in this case whatsoever."

The court declined to sentence petitioner to the maximum, imposing a sentence of eleven to twenty-two years on the manslaughter count and a concurrent term of seven and-a-half to fifteen years on the weapons count.

## V

Petitioner argues that the judge's final charge, given over defense objections, coerced a verdict in violation of due process by suggesting that the jury's failure to reach a verdict was based on unconscious racial prejudice. He says, quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237, 241, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), that any defendant "being tried by a jury is entitled to the uncoerced verdict of that body," and that the determination of whether the jury was "improperly coerced" requires consideration of the charge "in its context and under all the circumstances" (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965)).

Petitioner asserts that, "[j]udging by this totality of the circumstances standard," the charge violated his due process rights by shaming one or more jurors into abandoning their view of the evidence and voting to convict.

Petitioner has exhausted his state court remedies.

The first matter this Court considers is whether a decision to grant habeas corpus in this case would be announcing a "new rule" as described by the Supreme Court in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and in later Supreme Court decisions. See, *e.g., Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Sawyer v. Smith*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990); *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Wright v. West*, 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *Graham v. Collins*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); *Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); *Caspari v. Bohlen*, 510 U.S. 383, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Goeke v. Branch*, 514 U.S. 115, 115 S.Ct. 1275, 131

L.Ed.2d 152 (1995); *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Lambrix v. Singletary,* 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

■ The *Teague* principle prohibits a lower Federal court from granting habeas corpus relief to a state prisoner based on a "new rule" announced or applied after the conviction has become final. *Stringer,* 503 U.S. at 227, 112 S.Ct. at 1135. "[N]ew rules will not be applied or announced" in cases on collateral review unless they fall into one of two exceptions. *Penry,* 492 U.S. at 313, 109 S.Ct. at 2944. "[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Caspari,* 510 U.S. at 390, 114 S.Ct. at 953 (quoting from *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070).

The test of whether a defendant's claim "was dictated by then-existing precedent" is whether "the unlawfulness of [the] conviction was apparent to all reasonable jurists," *Lambrix,* 117 S.Ct. at 1525 (citing *Graham,* 506 U.S. at 477, 113 S.Ct. at 902–903). The State court decision must not be disturbed when that court has made a "reasonable, good faith interpretation of existing precedents." *Butler,* 494 U.S. at 415, 110 S.Ct. at 1217–1218. Moreover, the "precedent" referred to in these decisions is Supreme Court precedent because only that Court can "dictate" to a State court how it must interpret the Constitution. *Lindh v. Murphy,* 96 F.3d 856, 869 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *But see Ciak v. United States,* 59 F.3d 296, 302–303 (2d Cir.1995) (habeas corpus sought after a Federal, not a State, conviction) (dictum).

According to the Supreme Court, the *Teague* principle was adopted "to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered." *Sawyer,* 497 U.S. at 234, 110 S.Ct. at 2827. In other words, habeas corpus is "not to provide a mechanism for the continual reexamination" of such a conviction. *Id.*

There are two narrow exceptions to *Teague.* One is for new rules that place "certain kinds of primary, private individual conduct beyond the power of the law-making authority to proscribe." *Teague,* 489 U.S. at 307, 109 S.Ct. at 1073. The second is for " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 494 U.S. at 495, 110 S.Ct. at 1264 (citing *Teague,* 489 U.S. at 311, 109 S.Ct. at 1076). Neither of these exceptions applies here.

It is not beyond the power of New York State to proscribe conduct such as manslaughter. The second exception applies "only to a small core" of rules "so central to an accurate determination of innocence or guilt" as to implicate "the fundamental fairness or accuracy of the proceeding." *Graham,* 506 U.S. at 478, 113 S.Ct. at 903.

■ As Mr. Justice Souter stated concurring in *Wright,* 505 U.S. at 311–313, 112 S.Ct. at 2500–2501, the critical analysis in determining whether the *Teague* principle applies is the "identification of the rule on which the claim for habeas relief depends." The rule must, of course, predate the finality of the defendant's conviction, but must also be "specific enough to dictate the rule on which the conviction may be held to be unlawful." *Id.*

For example, in *Butler,* the defendant claimed that the Fifth Amendment forebade police interrogation about a crime after the suspect requests counsel even if the request occurs in the course of the investigation of a different, unrelated crime, as was held by the Supreme Court in *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), decided after Butler's conviction became final. Butler argued that the rule adopted by the Court in *Roberson* was "merely an application of *Edwards [v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ] to a slightly different set of facts." *Butler,* 494 U.S. at 414, 110 S.Ct. at 1217.

In *Edwards,* the Court held the police may not question a suspect about a crime for suspicion of which he is held once he invokes his right to counsel. In *Butler* the Court decided that the *Edwards* ruling did not extend to the facts of *Roberson,* which there-

fore had announced a "new rule." *Butler,* 494 U.S. at 415, 110 S.Ct. at 1217.

The Court explained that the fact that a court deems its decision to be within the "logical compass" of an earlier Supreme Court decision is not conclusive in deciding whether the later decision is a "new rule" under Teague. If the outcome of the later decision "was susceptible to debate among reasonable minds," then than decision has adopted a "new rule." *Id.*

■ Even if the prisoner's contention seeks a ruling from the State court that is "a predictable development" in constitutional law, that does not suffice to show that such a ruling would not be a "new rule." *Sawyer,* 497 U.S. at 235, 110 S.Ct. at 2827–2828. In *Sawyer* the prisoner argued that the prosecutor's closing argument violated the Eighth Amendment of the Constitution by diminishing the jury's sense of responsibility for the capital sentencing decision in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which had been decided a year after the prisoner's conviction became final. No Supreme Court case prior to *Caldwell* held a prosecutorial argument to be impermissible under the Eighth Amendment. The prior decisions cited by the Court in *Caldwell* were unrelated to prosecutorial argument and were cited for the general proposition that capital sentencing must have "guarantees of reliability." *Sawyer,* 497 U.S. at 235, 110 S.Ct. at 2828.

In *Sawyer* the prisoner argued that the *Caldwell* decision did not announce a "new rule" but "was dictated by the principle of reliability in capital sentencing." The Supreme Court rejected this argument saying that:

> the [Teague] test would be meaningless if applied at this level of generality. *Cf. Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ([I]f the test of "clearly established law" were to be applied at this level of generality, ... [p]laintiffs would be able to convert the rule of qualified immunity that our

cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.').

497 U.S. at 236, 110 S.Ct. at 2828.

Even a rule as particular as "a capital defendant must be afforded a meaningful opportunity to explain or deny the evidence introduced against him at sentencing" was held by the Supreme Court in *Gray,* 518 U.S. at 169, 116 S.Ct. at 2084, to be sufficiently general as to come within the *Teague* principle.

The Supreme Court cases have also recognized that "[t]he interests in finality, predictability, and comity underlying our new rule jurisprudence may be undermined to an equal degree by the invocation of a rule that was not dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent." *Stringer,* 503 U.S. at 228, 112 S.Ct. at 1135.

■ Of course, a habeas petitioner need not cite a Supreme Court case on all fours with his own. But he must show, relying only on Supreme Court precedents existing when his conviction became final, either that it would have been apparent to all reasonable jurists that the conviction was unlawful, or at least that the State court has made an unreasonable interpretation of those precedents. It is not enough for petitioner here merely to point to decisions announcing the general proposition that a jury verdict may not be "coerced," unless the State courts were unreasonable in deciding that the verdict was not "coerced." That proposition is hardly more specific than the due process clause itself.

## VI

■ Petitioner's basic argument is that the trial judge implied to the minority members of the jury: "The reason you may be having a problem in failing to reach a verdict is that one or more of you is casting your vote not on a rational analysis of the evidence but on racial grounds; otherwise, you would have already agreed upon a verdict." That is one plausible interpretation of the record; indeed, it is an interpretation adopted by the dissenting member of the Appellate Division.

But other remarks of the trial judge cast doubt on the implication that he was telling the jury that he believed that in the absence of racial considerations they would already have reached a verdict. He reminded the jurors that he was "not trying to coerce a verdict out of you," and "not saying that anyone should give up a conscientiously held belief based on the law and the evidence in the case." He restated that, absent proof beyond a reasonable doubt, "the verdict must be not guilty." In the context of those comments, the charge can plausibly be read as saying that it was "all right to adhere to your vote and have a hung jury, but you should make your determinations based on the evidence and not on irrational considerations such as sympathy or race."

The dissenting Justice of the Appellate Division acknowledged that the charge did tell the jurors they were not to give up their conscientiously-held beliefs. But he deemed that admonition to be insufficient to neutralize "the coercive nature" of the other instructions that "cast suspicion" on the motives of the jurors not voting with the majority, "sham[ing]" them into agreeing to a verdict. *Ramirez,* 223 A.D.2d at 660, 636 N.Y.S.2d at 849.

A majority of the Appellate Division Justices did not agree with this conclusion and held that the charge "was essentially neutral directed at the jurors in general, and did not coerce them to reach a verdict or to achieve a specific result." 223 A.D.2d at 656, 636 N.Y.S.2d at 848.

This Court does not determine as a matter of law whether under all the circumstances the charge was or was not constitutionally "coercive". But the Court is not prepared to rule that the three majority members of the New York Appellate Division were unreasonable in their holding.

## VII

Petitioner makes another and related argument, namely, that the trial judge discriminated against Black and Hispanic jurors by "injecting" race into the deliberations, although race had played no apparent role in the trial. Petitioner cites cases such as *Rose v. Mitchell,* 443 U.S. 545, 558, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979), holding invalid racial discrimination in the selection of the foreperson of the grand jury and stating that racial discrimination has no place "in the administration of justice." Petitioner also refers to *McFarland v. Smith,* 611 F.2d 414 (2d Cir.1979), and *U.S. ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973), granting habeas corpus in cases in which the state prosecutors' summations contained racial remarks, and cites the history of the Fourteenth Amendment and the Supreme Court cases commencing with *Moore v. Dempsey,* 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923) and *Strauder v. West Virginia,* 100 U.S. 303, 10 Otto 303, 25 L.Ed. 664 (1879).

While numerous Supreme Court cases since the adoption of the Fourteenth Amendment would by analogy be pertinent to petitioner's argument, he cites none as stating a rule that made it unreasonable for the State courts to decide that the charge did not deny either due process or equal protection.

For reasons already stated, petitioner's argument does not meet the test of *Teague.*

## VIII

Even if the foregoing analysis of the *Teague* doctrine is wrong and a Federal court may freely under that doctrine "announce" a "new rule" and grant habeas corpus, petitioner is not entitled to relief. His claim falls under the Antiterrorism and Effective Death Penalty Act of 1996 (the Act), Pub.L. No. 104–132, 119 Stat. 1214, signed into law on April 24, 1996.

The Act amended 28 U.S.C. § 2254(d)(1) to read:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

Petitioner's argument, adopted from James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 30.2c (2d ed. Supp. 1997), is as follows:

There are two parts to Section 2254(d)(1). The first prohibits the grant of habeas corpus unless the State court decision is "contrary to clearly established [Supreme Court] law." The second prohibits such a grant unless the decision "involved an unreasonable application" of such law.

In the first part, the term "contrary to clearly established [Supreme Court] law" applies when that law contains some rule designed to govern the petitioner's claim. If there is such a rule, petitioner argues, then a Federal habeas court is wholly free to determine whether it applies to the facts of the case, and grant habeas corpus even when the rule is as general as the one proposed here; namely, that a court is required not to "coerce" a verdict.

Only if the Supreme Court has not prescribed some such rule for resolving the petitioner's claim does the language of the second part of § 2254(d)(1) concerning "an unreasonable application" come into play, argues the petitioner. Absent such a rule, the Federal court may fashion its own rule out of the Supreme Court's peripherally pertinent precedents. But in so doing the Federal court may not act "unreasonably."

This is an ingenious argument. This Court does not accept it.

To interpret the Act, this Court must first ask itself what the "law" is to which the Act refers. Is it a general proposition of "law" declared by the Supreme Court and affecting not only the specific case but also other cases falling within its general terms? Or is it the "law" embodied in a Supreme Court decision applying a general proposition to the specific facts of the case—deciding, in other words, what has traditionally been described as a mixed question of law and fact?

It would not be fruitful to rehearse once again the ancient and lively debate seeking to describe what distinguishes questions of law, questions of fact, and mixed questions of law and fact. The Supreme Court has stated that perhaps much of the difficulty in draw-

ing the distinctions is that the decision to apply the appropriate label "is sometimes as much a matter of allocation as it is of analysis." *Miller v. Fenton,* 474 U.S. 104, 113, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985), citing Henry P. Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229, 237 (1985). The Court in *Miller* went on to say:

At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.

*Id.*

■■■■ In this Court's opinion, Congress has spoken in Section 2254(d)(1). It concluded that as a matter of the sound administration of justice a Federal habeas court faced with a mixed question of law and fact decided by the State court should decline to issue the writ unless the State trial and appellate courts have unreasonably applied constitutional principles clearly established by the Supreme Court.

Petitioner's argument restricting the language of "unreasonable application" to instances where the Supreme Court has articulated no pertinent rules would make the language almost entirely superfluous. There can hardly be many habeas cases where there is no general principle formulated by the Supreme Court that is at least arguably applicable.

Moreover, petitioner's interpretation would be inconsistent with the rationale of the *Teague* principle recognizing the interests of finality, predictability, and comity. *Stringer,* 503 U.S. at 228, 112 S.Ct. at 1135. Yet petitioner admits that the section "codifies a more restrictive version" of *Teague* doctrine.

A more sensible interpretation is that the "unreasonable application" wording applies not only when the Supreme Court has articulated no arguably applicable general principle but also when there is such a principle, here undisputed and applicable to the specific facts in issue. This case presents a mixed

question of law and fact. Section 2254(d)(1) prohibits habeas corpus unless the State courts' decision gave an "unreasonable" answer to the question. See *Lindh*, 96 F.3d at 870.

This Court concludes that the decision of the State courts reasonably applied the "law" announced by the Supreme Court that a criminal defendant is entitled to an uncoerced jury verdict.

## IX

Petitioner also urges that in any event section 2254(d)(1) is unconstitutional under Article III of the Constitution, providing that "[t]he judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." He also argues that the Act works an unconstitutional suspension of the writ of habeas corpus in violation of Article I, § 9, Cl. 2 of the Constitution, providing that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in cases of Rebellion or Invasion the public safety may require it."

For the reasons stated in *Lindh*, 96 F.3d at 867–871, this Court rejects both these arguments.

## X

The petition for a writ of habeas corpus is denied.

The Court issues a certificate of appealability because petitioner has made a substantial showing of the denial of constitutional rights under the Due Process Clause, Article III, and Article I § 9, Cl. 2.

So ordered.