IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-895

 Filed: 7 May 2019

Wake County, No. 16 CRS 215839

STATE OF NORTH CAROLINA

 v.

CHAD CAMERON COPLEY, Defendant.

 Appeal by defendant from judgment entered 23 February 2018 by Judge

Michael J. O’Foghludha in Wake County Superior Court. Heard in the Court of

Appeals 13 February 2019.

 Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L.
 Hyde, for the State.

 Massengale & Ozer, by Marilyn G. Ozer, for defendant.

 TYSON, Judge.

 Chad Cameron Copley (“Defendant”) appeals from a judgment entered

following a jury’s conviction for first-degree murder. We vacate Defendant’s

conviction and judgment and grant a new trial.

 I. Background

 On 22 August 2016, Defendant was indicted by a grand jury for first-degree

murder. Defendant’s trial began on 12 February 2018

 A. State’s Evidence
 STATE V. COPLEY

 Opinion of the Court

 At trial, the State presented evidence tending to show the following: On 6

August 2016, Jalen Lewis (“Lewis”) hosted a party at his parents’ home, two or three

houses down the street from Defendant’s house. One of his guests, Chris Malone

(“Malone”), and two companions, David Walker (“Walker”), and Kourey Thomas

(“Thomas”), arrived at Lewis’s party in Walker’s car around midnight, and parked on

the street. Malone was acquainted with Lewis. Walker and Thomas were not.

Malone entered Lewis’s house to ask permission for Walker and Thomas to enter.

Walker and Thomas waited outside near the front steps of the house.

 Sometime between midnight and 1:00 a.m., a group of approximately twenty

people arrived separately from Thomas, Walker, and Malone. Lewis and his friends

did not know the group of twenty people. After about ten minutes, the group was

asked to leave. The group agreed to leave, and walked toward their cars,

congregating near the curb in front of Defendant’s house to discuss where to go next.

 Defendant, who was inside his home and in his second-story bedroom, became

disturbed by the group’s noise outside. Defendant called 911 and told the operator

he was “locked and loaded” and going to “secure the neighborhood.” Defendant also

stated, “I’m going to kill him.” The operator attempted to obtain more information

from Defendant, but the phone call was terminated.

 At the same time these events were transpiring, a law enforcement officer was

conducting a traffic stop nearby, which caused the lights of his police cruiser to reflect

 -2-
 STATE V. COPLEY

 Opinion of the Court

down the street. Thomas and Walker saw the lights and became worried about the

presence of law enforcement because Thomas possessed a marijuana grinder on his

person.

 Thomas decided to leave the party after seeing the police cruiser’s lights.

Thomas left the party first. He ran from Lewis’s house, and cut across the yard,

towards Walker’s car. Before he could reach the car, Thomas was shot by Defendant,

who fired one shot without warning, from inside the window of his dark, enclosed

garage. EMS arrived and transported Thomas to the hospital, where he died as a

result of the gunshot.

 Wake County Sheriff’s Deputy Barry Carroll (“Deputy Carroll”) was one of the

first investigators to arrive upon the scene. Deputy Carroll approached Defendant’s

house after observing broken glass in Defendant’s driveway and a broken window in

the garage. He shined a light through a garage window, and saw Defendant step

through a door from the house into the garage. Deputy Carroll asked Defendant if

he had shot someone. Defendant admitted shooting Thomas. Deputy Carroll

requested Defendant to open the front door. Defendant complied and showed Deputy

Carroll the shotgun he had used to fire at Thomas.

 At the close of the State’s evidence, Defendant moved to dismiss the case. The

trial court denied the motion.

 B. Defendant’s Evidence

 -3-
 STATE V. COPLEY

 Opinion of the Court

 Defendant testified and presented evidence tending to show the following:

Defendant had argued with his wife on the morning of 6 August 2016, and then spent

the day at home drinking, sleeping, and “just hanging out in the garage.” After going

to sleep that evening in his upstairs bedroom, Defendant awoke at approximately

12:30 a.m. Defendant and his wife then had marital relations. Shortly thereafter,

Defendant looked out of his bedroom window and saw a group of people in front of his

house. Defendant described the group as “yelling and screaming” and “revving their

engines.”

 Irritated at the noise the group made, Defendant yelled out the window, “You

guys keep it the f[**]k down; I’m trying to sleep in here.” Members of the group yelled

back, “Shut the f[**]k up; f[**]k you; go inside, white boy,’ things of that nature.”

Defendant saw “firearms in the crowd[,]” and two individuals “lifted their shirts up”

to flash their weapons. He testified that he called 911 at 12:50 a.m. at his wife’s

request.

 When Defendant called 911, he thought his son and his son’s friends were

outside, and stated his teenaged son was the “him” he referenced he was going to

“kill” while on the 911 call. After ending the call with 911, he retrieved his shotgun,

loaded it, and walked downstairs into his attached garage.

 When he discovered his son was inside the garage and not part of the group

outside, he told his son to go upstairs for safety and to get a rifle. He again yelled at

 -4-
 STATE V. COPLEY

 Opinion of the Court

the group outside, instructing them to leave the premises and informing them that

he was armed. Defendant claimed Thomas began running towards Defendant’s house

and pulled out a gun. Defendant fired one shot from his shotgun towards Thomas

through the window of his garage.

 At the close of Defendant’s evidence, he renewed his motion to dismiss, which

the trial court denied. Following deliberation, the jury found Defendant guilty of first

degree murder by premeditation and deliberation and by lying in wait. The trial

court sentenced Defendant to life without parole. Defendant gave notice of appeal in

open court.

 II. Jurisdiction

 Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-

1444 (2017).

 III. Issues

 Defendant argues three issues on appeal: (1) the trial court plainly erred by

instructing the jury that the defense of habitation was not available if Defendant was

the aggressor; (2) the trial court erred by allowing the prosecutor to make egregious,

improper, and racially-charged arguments during its closing argument; and (3) the

trial court erred by instructing the jury on the theory of lying in wait.

 IV. Race-based Argument

 -5-
 STATE V. COPLEY

 Opinion of the Court

 We first address Defendant’s argument that the trial court erred by overruling

his objections to racially-charged statements made by the prosecutor during closing

arguments.

 During the State’s rebuttal closing argument, the prosecutor stated, over

Defendant’s multiple objections:

 [PROSECUTOR]: And while we’re at it . . . I have at every
 turn attempted not to make this what this case is about.
 And at every turn, jury selection, arguments, evidence,
 closing argument, there’s been this undercurrent, right?
 What’s the undercurrent? The undercurrent that the
 defendant brought up to you in his closing argument is
 what did he mean by hoodlums? I never told you what he
 meant by hoodlums. I told you he meant the people outside.
 They presented the evidence that [Defendant is] scared of
 these black males. And let’s call it what it is. Let’s talk
 about the elephant in the room. [Emphasis supplied].

 [DEFENSE COUNSEL]: Objection.

 The Court: Overruled.

 [PROSECUTOR]: Let’s talk about the elephant in the room.
 If they want to go there, consider it. And is it relevant for
 you? Because we talked about that self-defense issue, right,
 and reasonable fear. What is a reasonable fear? You get to
 determine what’s reasonable. Ask yourself if Kourey
 Thomas and these people outside were a bunch of young,
 white males walking around wearing N.C. State hats, is he
 laying [sic] dead bleeding in that yard? [Emphasis
 supplied].

 [DEFENSE COUNSEL]: Objection.

 The COURT: Overruled.

 -6-
 STATE V. COPLEY

 Opinion of the Court

 [PROSECUTOR]: Think about it. I’m not saying that’s why
 he shot him, but it might’ve been a factor he was
 considering. You can decide that for yourself. You’ve heard
 all the evidence. Is it reasonable that he’s afraid of them
 because they’re a black male outside wearing a baseball cap
 that happens to be red? They want to make it a gang thing.
 The only evidence in this case about gangs is that nobody
 knows if anybody was in a gang. That’s the evidence. They
 can paint it however they want to paint it, but you all swore
 and raised your hand when I asked you in jury selection if
 you would decide this case based on the evidence that you
 hear in the case, and that’s the evidence. Now,
 reasonableness and that fear, a fear based out of hatred or
 a fear based out of race is not a reasonable fear, I would
 submit to you. That’s just hatred. And I’m not saying that’s
 what it is here, but you can consider that. And if that’s what
 you think it was, then maybe it’s not a reasonable fear.
 [Emphasis supplied].

 A. Standard of Review

 The Supreme Court of North Carolina held that a defendant’s objection made

during closing argument should be reviewed as if the defendant had objected to every

instance of the challenged statements. State v. Walters, 357 N.C. 68, 104, 588 S.E.2d

344, 365, cert. denied, 540 U.S. 971, 157 L. Ed. 2d 320 (2003). In Walters, the

prosecutor made a closing argument comparing the defendant to Adolf Hitler. Id. The

defendant’s counsel objected, and the trial court overruled the objection. Id. The

prosecutor then continued making allusions comparing the defendant to Hitler.

 Our Supreme Court reasoned:

 Whereas it is customary to make objections during trial,
 counsel are more reluctant to make an objection during the
 course of closing arguments “for fear of incurring jury

 -7-
 STATE V. COPLEY

 Opinion of the Court

 disfavor.” Defendant should not be penalized twice (by the
 argument being allowed and by her proper objection being
 waived) because counsel does not want to incur jury
 disfavor. Therefore, defendant properly objected to the
 prosecutor’s argument, and no waiver occurred by
 defendant’s failure to object to later references to Hitler.

Id. (citation omitted).

 When a defendant properly objects to closing argument, the Court must

determine if “the trial court abused its discretion by failing to sustain the objection.”

Id. at 104, 588 S.E.2d at 366 (citation omitted). We “first determine if the remarks

were improper. Next, we determine if the remarks were of such a magnitude that

their inclusion prejudiced defendant, and thus should have been excluded by the trial

court.” Id. (citations and internal quotation marks omitted). Following Walters,

Defendant’s multiple objections at trial and arguments against the prosecutor’s racial

comments are preserved for appellate review. See id.

 “When a court determines that an argument is improper, a defendant must

prove that the statements were of such a magnitude that their inclusion prejudiced

[the] defendant and that a reasonable possibility exists that a different result would

have been reached had the error not occurred.” State v. Dalton, 243 N.C. App. 124,

135, 776 S.E.2d 545, 553 (2015) (alteration in original) (internal quotation marks and

citation omitted), aff’d, 369 N.C. 311, 794 S.E.2d 485 (2016).

 B. Closing Arguments

 -8-
 STATE V. COPLEY

 Opinion of the Court

 This Court has recently decided a large number of appeals in which prosecutors

made improper comments and statements during closing arguments. See, e.g., State

v. Degraffenried, __ N.C. App. __, __, 821 S.E.2d 887, 889 (2018) (holding that

prosecutor made improper reference to the defendant’s exercise of his right to trial by

jury); State v. Phachoumphone, __ N.C. App. __, __, 810 S.E.2d 748, 759 (holding that

prosecutor inappropriately cited witnesses’ out-of-court statements as substantive

evidence), review allowed, __ N.C. __, 818 S.E.2d 111 (2018); State v. Madonna, __

N.C. App. __, __, 806 S.E.2d 356, 363 (2017) (holding that prosecutor improperly

stated that the defendant had lied to the jury), review denied, 370 N.C. 696, 811

S.E.2d 161 (2018).

 Our Supreme Court has stated: “The prosecuting attorney should use every

honorable means to secure a conviction, but it is his duty to exercise proper restraint

so as to avoid misconduct, unfair methods or overzealous partisanship which would

result in taking unfair advantage of an accused.” State v. Holmes, 296 N.C. 47, 50,

249 S.E.2d 380, 382 (1978) (citations omitted).

 The General Rules of Practice for the Superior and District Courts provide, in

relevant part: “Counsel are at all times to conduct themselves with dignity and

propriety[,]” and “[t]he conduct of the lawyers before the court and with other lawyers

should be characterized by candor and fairness[.]” Gen. R. Pract. Super. and Dist. Ct.

12, 2019 Ann. R. N.C. 10-12.

 -9-
 STATE V. COPLEY

 Opinion of the Court

 The Preamble to the North Carolina Revised Rules of Professional Conduct

states that “A lawyer, as a member of the legal profession, is . . . an officer of the legal

system, and a public citizen having special responsibility for the quality of justice.”

Rule of Professional Conduct 3.4(e) states that “A lawyer shall not . . . in trial, allude

to any matter that the lawyer does not reasonably believe is relevant or that will not

be supported by admissible evidence[.]” All licensed attorneys, whether representing

the State or a defendant, must be ever mindful of their oaths and duties as officers of

the court and the important roles they serve in the impartial administration of

justice. See id.

 C. Injection of Race

 Long-standing precedents of the Supreme Courts of the United States and

North Carolina prohibit superfluous injections of race into closing arguments. “The

Constitution prohibits racially biased prosecutorial arguments.” McCleskey v. Kemp,

481 U.S. 279, 309 n.30, 95 L. Ed. 2d 262, 289 n.30 (1987) (citation omitted).

“[P]rosecutor[s] may not make statements calculated to engender prejudice or incite

passion against the defendant. Thus, overt appeals to racial prejudice, such as the

use of racial slurs, are clearly impermissible. Nor may a prosecuting attorney

emphasize race, even in neutral terms, gratuitously.” State v. Williams, 339 N.C. 1,

24, 452 S.E.2d 245, 259 (1994) (citations and internal quotation marks omitted),

disapproved of on other grounds by State v. Warren, 347 N.C. 309, 492 S.E.2d 609

 - 10 -
 STATE V. COPLEY

 Opinion of the Court

(1997). Gratuitous appeals to racial prejudice “tend to degrade the administration of

justice.” Battle v. United States, 209 U.S. 36, 39, 52 L. Ed. 670, 673 (1908).

 Our Supreme Court has instructed: “Closing argument may properly be based

upon the evidence and the inferences drawn from that evidence.” State v. Diehl, 353

N.C. 433, 436, 545 S.E.2d 185, 187 (2001) (citing State v. Oliver, 309 N.C. 326, 357,

307 S.E.2d 304, 324 (1983)). “Although it is improper gratuitously to interject race

into a jury argument where race is otherwise irrelevant to the case being tried,

argument acknowledging race as a motive or factor in a crime may be entirely

appropriate.” Id. (emphasis supplied) (citing State v. Moose, 310 N.C. 482, 492, 313

S.E.2d 507, 515 (1984)).

 In Moose, our Supreme Court held a white defendant’s reference to a black

victim as a “damn ni[**]er” along with evidence that the victim was seen driving

through a white residential community, was sufficient evidence to support a

prosecutor’s closing argument that the victim’s murder was, in part, racially

motivated. 310 N.C. at 492, 313 S.E.2d at 515. Unlike the facts in Moose, no evidence

presented to the jury in this case tends to suggest Defendant had a racially motivated

reason for shooting Thomas.

 Here, the prosecutor prefaced his final argument by acknowledging the

absence of any evidence of racial bias: “I have at every turn attempted not make . . .

[race] what this case is about.” Despite the absence of evidence, he then argued that

 - 11 -
 STATE V. COPLEY

 Opinion of the Court

because Defendant’s race is white, he was motivated to shoot and kill Thomas because

he was black.

 The prosecutor asserted in his closing argument: “They presented the evidence

that he’s scared of these black males.” Nothing in the evidence presented to the jury

tends to support this assertion in the prosecutor’s argument that Defendant feared

or bore racial hatred towards the individuals outside of his home because they were

black. The only evidence submitted to the jury regarding race was Defendant’s

testimony that the members of the group outside his house had told him to “go inside,

white boy,” after he had raised his bedroom window and shouted at them to quiet

down shortly before 12:50 a.m. Race was irrelevant to Defendant’s case.

 In the final argument, the prosecutor noted the evidence that Defendant

claimed to be fearful of the group in the yard because he thought they may be in a

gang: “They want to make it a gang thing. The only evidence in this case about gangs

is that nobody knows if anybody was in a gang.”

 In its brief on appeal, the State attempts to find some evidentiary basis for the

racial comments in the closing argument, but in this effort inadvertently

acknowledges the complete absence of evidence regarding race. In short, the State

equates gang membership to black males. The State specifically argues Defendant

presented evidence that the “partygoers included suspected gang members” and

“[t]heir affiliation was suspected based on their wearing gang colors, particularly

 - 12 -
 STATE V. COPLEY

 Opinion of the Court

red.” The State includes a footnote noting “Red is worn by members of the Bloods, a

primarily African American street gang. See e.g., State v. Kirby, N.C. App. 446, 449,

697 S.E.2d 496, 499 (2010); State v. Riley, 159 N.C. App. 546, 549, 583 S.E.2d 379,

382 (2003).” (Emphasis supplied). In the Kirby and Riley cases, there was evidence

that Bloods gang members wore red articles and clothing. See Kirby, 206 N.C. App.

at 449, 697 S.E.2d at 499 (“Defendant also said that he felt disrespected by Dunn

because he was wearing a “Scream” mask with red on it, like blood, because defendant

was a member of the Blood gang and Dunn was a member of the Folk gang.”); Riley,

159 N.C. App. at 549, 583 S.E.2d at 382 (“Officer Smith said that “Bloods” typically

wear the color red and “Crips” wear the color blue, although at times, rival gang

members will wear the other gang’s colors to get closer in order to commit violent

acts.”).

 There is no mention in either Kirby or Riley that the Bloods gang is “primarily

African American” and no evidence was presented in this case of the race of members

of any gang. Citations to other cases does not provide evidence in this case of any

association between the color red, gangs, and black males. No evidence was presented

to the jury in this case the Bloods are a “primarily African American” gang, and there

was no evidence that Defendant was aware of the typical racial profile of any gang.

The only evidence was that Defendant, as well as the hosts of the party, suspected

gang activity, and that they were fearful, was because they knew that gang members

 - 13 -
 STATE V. COPLEY

 Opinion of the Court

may carry guns. Their fear was based upon their knowledge of the dangers posed by

guns and gangs generally; the fear was not associated with the race of the group

ejected from the party.

 After its argument equating gang membership and black men, the State

argues in its appellee brief that the prosecutor’s racially-based argument was proper

because:

 [T]he jury had to determine whether Defendant’s fear was
 reasonable. Insofar as Defendant expressed a fear of gang
 members wearing gang colors, the prosecutor aptly
 inquired whether a white male would elicit the same
 scrutiny. As the prosecutor said, a fear based on race is not
 a reasonable fear. The prosecutor is permitted to argue the
 law, and these remarks were not improper. See Diehl, 353
 N.C. at 436, 545 S.E.2d at 187. [Emphasis supplied].

 The State’s argument insinuates Defendant could have believed the

individuals outside his house were gang members because they were black. No

admitted evidence suggests Defendant might have thought the individuals were gang

members because of their race. The State’s argument that Defendant might have

inferred the individuals were gang members because of their race is offensive, invalid,

and not supported by any evidence before the jury.

 No logical connection exists between Defendant recounting that he was

referred to as “white boy” by those individuals outside his home and the prosecutor’s

invidious inference that Defendant held an irrational fear or exhibited hatred of

Thomas and the other black partygoers to allow this closing argument. The

 - 14 -
 STATE V. COPLEY

 Opinion of the Court

prosecutor’s comments are a wholly gratuitous injection of race into the trial and were

improper. See Williams, 339 N.C. at 24, 452 S.E.2d at 259. The prosecutor’s

comments are especially egregious because he made them during the State’s final

rebuttal argument to the jury, which left defense counsel with no opportunity to

respond, other than by objecting.

 The prosecutor also asserted Defendant had referred to the individuals outside

his house as “hoodlums.” No evidence suggests Defendant’s use of the word

“hoodlums” bore any racial connotation. On direct examination, Defendant testified

he had used the term “hoodlum” to mean “Like a juvenile delinquent, someone that

will not listen to authority or listen to their parents and just kind of takes [sic] every

day as that day and doesn’t care about tomorrow. They’re living in that day because

that’s all they care about.” Defendant also described his own teen-aged son as a

“hoodlum.”

 “Hoodlum” is defined as: “1. A gangster; a thug. 2. A tough, often aggressive

or violent youth.” Hoodlum, The American Heritage Dictionary of the English

Language, Fifth Edition, https://ahdictionary.com/word/search.html?q=hoodlum (last

visited on 4 April 2019). Nothing in either Defendant’s use of the term nor the

dictionary definition of “hoodlum,” suggests any racial bias or animus on Defendant’s

part. No evidence presented at trial suggested the word “hoodlum” has a racial

 - 15 -
 STATE V. COPLEY

 Opinion of the Court

connotation. The prosecutor’s injection of racially-based arguments were gratuitous

and improper. Williams, 339 N.C. at 24, 452 S.E.2d at 259.

 “Discrimination on the basis of race, odious in all aspects, is especially

pernicious in the administration of justice.” Rose v. Mitchell, 443 U.S. 545, 555, 61 L.

Ed. 2d 739 (1979). The United States Court of Appeals for the Fourth Circuit

reviewed a case from North Carolina, which involved a prosecutor’s jury argument

that a white woman would never have consensual intercourse with a black man.

Miller v. North Carolina, 583 F.2d 701, 707 (1978). The Court held that the

prosecutor’s statements denied the defendants of their constitutional right to a fair

trial and stated “an appeal to racial prejudice impugns the concept of equal protection

of the laws. One of the animating purposes of the equal protection clause of the

fourteenth amendment, and a continuing principle of its jurisprudence, is the

eradication of racial considerations from criminal proceedings.” Miller v. North

Carolina, 583 F.2d 701, 707 (4th Cir. 1978).

 The United States Court of Appeals for the Second Circuit persuasively stated

in McFarland v. Smith, 611 F.2d 414, 416-17 (2nd Cir. 1979):

 Race is an impermissible basis for any adverse
 governmental action in the absence of compelling
 justification. . . . To raise the issue of race is to draw the
 jury’s attention to a characteristic that the Constitution
 generally commands us to ignore. Even a reference that is
 not derogatory may carry impermissible connotations, or
 may trigger prejudiced responses in the listeners that the
 speaker might neither have predicted nor intended.

 - 16 -
 STATE V. COPLEY

 Opinion of the Court

 The prosecutor’s objected-to rebuttal jury arguments served to “draw the jury’s

attention” to Defendant’s race being white and Thomas’s race being black, inject

prejudice, and unjustifiably suggested the jury could or should infer Defendant is

racist. See id.

 D. Other Jurisdictions

 Courts of other federal and state jurisdictions have also granted new trials

when prosecutors had gratuitously injected race into closing arguments. See, e.g.,

United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996) (awarding a new trial

where prosecutor twice called two “African–American Defendants ‘bad people’ and

[called] attention to the fact that the Defendants were not locals.”), abrogated on other

grounds by Watson v. United States, 552 U.S. 74, 169 L. Ed. 2d 472 (2007); Tate v.

State, 784 So. 2d 208, 216 (Miss. 2001) (holding prosecutor’s comments regarding

defendant’s allegedly racist sentiments were improper and prejudicial where race

was irrelevant to the defendant’s assault charge).

 In State v. Cabrera, 700 N.W.2d 469, 473 (Minn. 2005), the Supreme Court of

Minnesota reviewed a prosecutor’s race-based closing argument made during a first-

degree murder trial. During closing argument the prosecutor stated:

 Prosecutor: Now, the defense case in addition to the-in
 addition to just throwing mud on young black men and
 saying that they’re-if they’re young black men they must
 be in gangs-

 - 17 -
 STATE V. COPLEY

 Opinion of the Court

 Defense: Objection, Your Honor. It was never our
 contention to be racist in this case.

 Court: Overruled. It’s argument.

Id. at 474.

 During the rebuttal portion of closing argument, the prosecutor also stated:

 Finally, the other thing you didn’t hear in the courtroom,
 other than counsel who apparently is an expert on gangs,
 you heard nothing about gangs. You heard nothing about
 gangs other than what came from the State’s witnesses
 telling about their past association and some wild and, I
 submit, racist speculation on the part of counsel here, that
 because these men who happen to be black are in-have been
 in gangs in the past, despite their testimony about trying
 to get on with their lives, that they are people to be feared,
 they’re rough characters. Well, we know what that’s a code
 word for. He’s a big, strong black man, but he’s a rough
 character.

 Members of the Jury, this is not about race.

Id. (emphasis supplied). The defense counsel also objected to this comment, which

the trial court overruled. Id.

 On appeal, the Supreme Court of Minnesota noted: “The defense never

mentioned the race of a witness or even implied that race was a factor in this case

during his examination of witnesses or in closing argument.” Id. The Court reasoned

“the defense properly objected to the prosecutor’s improper statements, but was

erroneously overruled. Working in tandem, the improper argument and the court’s

ruling may have led the jury to conclude that defense counsel himself was racist-an

 - 18 -
 STATE V. COPLEY

 Opinion of the Court

implication wholly unsupported by the record.” Id. at 474-75. The Court concluded

“that the prosecutor’s statements injecting race into closing argument were serious

prosecutorial misconduct.” Id. at 475.

 The Court ultimately held that the prosecutor’s misconduct warranted a new

trial, despite the strong evidence of guilt, because:

 Bias often surfaces indirectly or inadvertently and can be
 difficult to detect. We emphasize, nonetheless, that the
 improper injection of race can affect a juror’s impartiality
 and must be removed from courtroom proceedings to the
 fullest extent possible. Affirming this conviction would
 undermine our strong commitment to rooting out bias, no
 matter how subtle, indirect, or veiled.

Id. (citation and quotation marks omitted). This reasoning of the Supreme Court of

Minnesota, regarding the dangers of gratuitously injecting race into closing argument

and to grant a new trial in that first-degree murder case, provides a persuasive and

compelling basis for granting Defendant a new trial. See id.

 E. State v. Jones

 With regard to this State’s precedents, Defendant cites our Supreme Court’s

opinion in State v. Jones, 355 N.C. 117, 558 S.E.2d 97 (2002). In Jones, the defendant

was also charged with first-degree murder. Id. at 119, 558 S.E.2d at 99. The

prosecutor referenced the Columbine school shooting and the Oklahoma City

bombing during closing arguments and attempted to link those tragedies to the

 - 19 -
 STATE V. COPLEY

 Opinion of the Court

tragedy of the victim’s death, even though they were wholly unrelated events. Id. at

132, 558 S.E.2d at 107.

 Our Supreme Court held that this closing argument was improper because:

“(1) it referred to events and circumstances outside the record; (2) by implication, it

urged jurors to compare defendant’s acts with the infamous acts of others; and (3) it

attempted to lead jurors away from the evidence by appealing instead to their sense

of passion and prejudice.” Id.

 Our Supreme Court held the statements were prejudicial because:

 The impact of the statements in question, which conjure up
 images of disaster and tragedy of epic proportion, is too
 grave to be easily removed from the jury’s consciousness,
 even if the trial court had attempted to do so with
 instructions. Moreover, the offensive nature of the
 remarks exceeds that of other language that has been tied
 to prejudicial error in the past. See, e.g., State v. Wyatt, 254
 N.C. 220, 222, 118 S.E.2d 420, 421 (1961) (holding that a
 prosecutor who described defendants as “two of the slickest
 confidence men” committed reversible error); State v.
 Tucker, 190 N.C. 708, 709, 130 S.E. 720, 720 (1925)
 (holding that it was prejudicial error for a prosecutor to say
 that the defendants “look[ed] like . . . (professional)
 bootleggers”); State v. Davis, 45 N.C. App. 113, 114-15, 262
 S.E.2d 329, 329-30 (1980) (holding that it was prejudicial
 for a prosecutor to call the defendant a “mean S.O.B.”). As
 a result, we hold that the trial court abused its discretion[.]

Id. at 132-33, 558 S.E.2d at 107.

 Here, no admitted evidence, including Defendant being told to “go inside, white

boy,” or his use of the word “hoodlum,” tended to show or support any inference

 - 20 -
 STATE V. COPLEY

 Opinion of the Court

Defendant had shot Thomas for racially-prejudiced reasons. The prosecutor’s

comments improperly cast Defendant as a racist, and his comment implying race was

“the elephant in the room” is a brazen and inflammatory attempt to interject race as

a motive into the trial and present it for the jury’s consideration. Williams, 339 N.C.

at 24, 452 S.E.2d at 259.

 As in Jones, the prosecutor’s appeal to the jury’s emotions “is too grave to be

easily removed from the jury’s consciousness.” Id. at 132, 538 S.E.2d at 107. The

offensive nature of the prosecutor’s comments exceeded language that our Supreme

Court in Jones noted was held to be prejudicial error warranting new trials in past

cases. See id.

 The trial court committed prejudicial error by overruling Defendant’s repeated

objections and by failing to instruct the jury to disregard the prosecutor’s

inflammatory comments or to declare a mistrial. Defendant is entitled to a new trial.

Id. at 132-33, 558 S.E.2d at 107.

 F. Pattern Jury Instruction

 As we have determined Defendant must receive a new trial based upon the

improper injection of race into the closing argument. We need not and will not

address Defendant’s remaining issues, which may not arise upon remand. We note

that Defendant’s other issues are based upon the jury instructions, and particularly

the combination of theories of self-defense, defense of habitation, initial aggressor,

 - 21 -
 STATE V. COPLEY

 Opinion of the Court

and lying in wait. We recognize the difficulty of crafting jury instructions in a case

with this combination of issues. For guidance on remand, we point out one potential

problem with the pattern jury instructions.

 The trial court gave jury instructions on both self-defense and defense of

habitation. The recently revised defense of habitation statute defines “home” as “A

building or conveyance of any kind, to include its curtilage, whether the building or

conveyance is temporary or permanent, mobile or immobile, which has a roof over it,

including a tent, and is designed as a temporary or permanent residence.” N.C. Gen.

Stat. § 14-51.2(a)(1) (2017) (emphasis supplied).

 The pattern instruction for the defense of habitation does not define the term

“home.” Footnote 1 of the pattern instruction references State v. Blue, 355 N.C. 79,

565 S.E.2d 133 (2002), for the principle that the

 defense of habitation can be applicable to the porch of a
 dwelling under certain circumstances and that the
 question of whether a porch, garage, or other appurtenance
 attached to a dwelling is within the home . . . for purposes
 of N.C. Gen. Stat. § 14-51.1 is a question best left to the
 jury.

N.C.P.I. Crim.-308.80, fn. 1 (2012).

 N.C. Gen. Stat. § 14-51.1, referenced above, was the former defense of

habitation statute, which was repealed upon the enactment of N.C. Gen. Stat. § 14-

51.2. 2011 Sess. Laws 268, § 2. The now-repealed N.C. Gen. Stat. § 14-51.1 did not

provide a definition for “home.” N.C.P.I. Crim. 308.80’s reference to State v. Blue,

 - 22 -
 STATE V. COPLEY

 Opinion of the Court

which interpreted a now-repealed statute, limited the reach and boundaries of

“home.”

 Furthermore, the absence of any definition of “home” to correctly reflect the

now-controlling definition in N.C. Gen. Stat. § 14-51.2(a)(1), which expands the

definition and incorporates “curtilage” as part of the “home,” is potentially prejudicial

to a defendant. The term “curtilage” is not defined within N.C. Gen. Stat. § 14-51.2,

but in other contexts, “curtilage” has been construed to mean “at least the yard

around the dwelling house as well as the area occupied by barns, cribs, and other

outbuildings.” State v. Frizzelle, 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955).

 A jury instruction given at a trial, based upon the current pattern instruction,

could lead a jury to believe defense of habitation is only appropriate when an intruder

has entered, or was attempting to enter a physical house or structure, and not the

curtilage or other statutorily defined and included areas.

 In the instant case, the trial court failed to provide a definition for “home” in

the jury instructions. While not argued, a discrepancy exists between N.C.P.I. Crim.

308.80 and the controlling N.C. Gen. Stat. § 14-51.2. The jury could have potentially

believed that Defendant could only have exercised his right of self-defense and to

defend his habitation only if Thomas was attempting to enter the physical confines

of Defendant’s house, and not the curtilage or other areas.

 - 23 -
 STATE V. COPLEY

 Opinion of the Court

 The absence of a definition for “home” or “curtilage” in the pattern instruction,

and the reference to State v. Blue and the now repealed statute, is not consistent with

the current statute. The pattern instruction should be reviewed and updated to

reflect the formal and expanded definition of “home” as is now required by N.C. Gen.

Stat. § 14-51.2.

 V. Conclusion

 The prosecutor’s argument that Defendant shot Thomas because he was black

is not supported by any admitted evidence and is wholly gratuitous and

inflammatory.

 The prosecutor’s argument was an improper and prejudicial appeal to race and

the jurors’ “sense of passion and prejudice.” See Jones, 355 N.C. at 132, 558 S.E.2d at

107; see also McCleskey, 481 U.S. at 309 n.30, 95 L. Ed. 2d at 289 n.30; Williams, 339

N.C. at 24, 452 S.E.2d at 259.

 The trial court prejudicially erred by overruling Defendant’s repeated

objections and by failing to strike the prosecutor’s inflammatory and improper

statements. We vacate Defendant’s conviction and the trial court’s judgment, and

remand for a new trial with proper instructions. It is so ordered.

 NEW TRIAL.

 Judge STROUD concurs.

 Judge ARROWOOD dissents in a separate opinion.

 - 24 -
 No. COA18-895 – State v. Copley

 ARROWOOD, Judge, dissenting.

 I respectfully dissent. I would hold the trial court did not abuse its discretion

in overruling defendant’s objection to the portion of the State’s closing argument that

defendant argues, and the majority agrees, violated defendant’s constitutional rights

by allowing the State to argue the victim would not have been shot if he had been

white. During closing argument, the State argued:

 [THE STATE]: And while we’re at it . . . I have at every
 turn attempted to not make this what this case is about.
 And at every turn, jury selection, arguments, evidence,
 closing argument, there’s been this undercurrent, right?
 What’s the undercurrent? The undercurrent that the
 defendant brought up to you in his closing argument is
 what did he mean by hoodlums? I never told you what he
 meant by hoodlums. I told you he meant the people
 outside. They presented the evidence that he’s scared of
 these black males. And let’s call it what it is. Let’s talk
 about the elephant in the room.

 [DEFENSE COUNSEL]: Objection.

 THE COURT: Overruled.

 [THE STATE]: Let’s talk about the elephant in the room.
 If they want to go there, consider it. And why is it relevant
 for you? Because we talked about that self-defense issue,
 right, and reasonable fear. What is a reasonable fear? You
 get to determine what’s reasonable. Ask yourself if Kourey
 Thomas and these people outside were a bunch of young,
 white males walking around wearing N.C. State hats, is he
 laying [sic] dead bleeding in that yard?

 [DEFENSE COUNSEL]: Objection.

 THE COURT: Overruled.
 STATE V. COPLEY

 ARROWOOD, J., dissenting

 [THE STATE]: Think about it. I’m not saying that’s why
 he shot him, but it might’ve been a factor he was
 considering. You can decide that for yourself. You’ve heard
 all the evidence. Is it reasonable that he’s afraid of them
 because they’re a black male outside wearing a baseball
 cap that happens to be red? They want to make it a gang
 thing. The only evidence in this case about gangs is that
 nobody knows if anybody was in a gang. That’s the
 evidence. They can paint it however they want to paint it,
 but you all swore and raised your hand when I asked you
 in jury selection if you would decide this case based on the
 evidence that you hear in the case, and that’s the evidence.
 Now, reasonableness and that fear, a fear based out of
 hatred or a fear based out of race is not a reasonable fear,
 I would submit to you. That’s just hatred. And I’m not
 saying that’s what it is here, but you can consider that.
 And if that’s what you think it was, then maybe it’s not a
 reasonable fear.

Defendant contends these statements were improper because there was no evidence

defendant was motivated by hatred or would have not shot the victim if he were

white, and this argument is a ploy to encourage jurors to convict defendant based on

passion.

 Our Court reviews alleged “improper closing arguments that provoke timely

objection from opposing counsel” for “whether the trial court abused its discretion by

failing to sustain the objection.” State v. Jones, 355 N.C. 117, 131, 558 S.E.2d 97, 106

(2002) (citations omitted). “[T]o assess whether a trial court has abused its discretion

when deciding a particular matter, this Court must determine if the ruling could not

have been the result of a reasoned decision.” Id. (citation and internal quotation

marks omitted).

 2
 STATE V. COPLEY

 ARROWOOD, J., dissenting

 “The Constitution prohibits racially biased prosecutorial arguments.”

McCleskey v. Kemp, 481 U.S. 279, 309 n. 30, 95 L. Ed. 2d 262, 289 n. 30 (1987) (citation

omitted). Therefore, although parties are generally “given wide latitude in their

closing arguments to the jury,” State v. Fletcher, 370 N.C. 313, 319, 807 S.E.2d 528,

534 (2017) (citation and internal quotation marks omitted), prosecutors cannot “make

statements calculated to engender prejudice or incite passion against the defendant.

Thus, overt appeals to racial prejudice, such as the use of racial slurs, are clearly

impermissible.” State v. Williams, 339 N.C. 1, 24, 452 S.E.2d 245, 259 (1994)

(citations and internal quotation marks omitted), disapproved of on other grounds by

State v. Warren, 347 N.C. 309, 492 S.E.2d 609 (1997). Prosecutors also may not

“emphasize race, even in neutral terms, gratuitously.” Id. (citations omitted).

 However, a prosecutor may make “[n]onderogatory references to race . . . if

material to issues in the trial and sufficiently justified to warrant the risks inevitably

taken when racial matters are injected into any important decision-making.” Id.

(citation and internal quotation marks omitted). As such, “argument acknowledging

race as a motive or factor in a crime may be entirely appropriate.” State v. Diehl, 353

N.C. 433, 436, 545 S.E.2d 185, 187 (2001) (citing State v. Moose, 310 N.C. 482, 492,

313 S.E.2d 507, 515 (1984) (holding there was sufficient evidence to support jury

argument that murder was, at least in part, racially motivated where a white

 3
 STATE V. COPLEY

 ARROWOOD, J., dissenting

defendant used an ignoble racial slur to refer to a black victim, and evidence showed

the victim was seen driving through a white community)).

 I would hold the court did not abuse its discretion in overruling defendant’s

objection to this portion of the State’s closing argument.

 Throughout defendant’s trial, the State alleged defendant’s motive was that

defendant had a bad day and was “ticked off” and was not “going to take it anymore.”

The State brought up race for the first time in closing argument. These comments

were brief, and not an appeal to racial animosity. Instead, the comments argued it

would be unreasonable to be afraid of the group outside the house because of race,

and that race could have been a factor considered by defendant. Under the facts of

this case, where the State’s evidence showed a lone, agitated white defendant

threatened a large group of black individuals, defendant alleged they referred to him

as a “white boy,” and then hid and waited, eventually shooting a young black man

who entered the area along the curb of his yard, the trial court did not abuse its

discretion in allowing the State’s closing argument to acknowledge the potential for

racial bias as a factor affecting the crime.

 Although I disagree with the majority on this issue, I agree with its disapproval

of the State’s argument that equates gang membership with race. No evidence in the

record supports this equivalency. I admonish the State to refrain from arguments

that are unsupported by the evidence, but, rather, that play to offensive stereotypes.

 4
 STATE V. COPLEY

 ARROWOOD, J., dissenting

 Because I disagree with the majority’s holding, I must discuss defendant’s

remaining arguments on appeal: (1) that the prosecutor misstated the law on the

habitation defense twice during his closing argument; (2) that the trial court plainly

erred by instructing the jury that the defense of habitation was not available if

defendant was the aggressor; and (3) that the trial court erred by instructing the jury

on the theory of lying in wait.

 I. Closing Argument

 Defendant argues the prosecutor misstated the law on the habitation defense

twice during his closing argument. He did not object on this basis at trial. If opposing

counsel fails to object to the closing argument at trial, we review alleged improper

closing arguments for

 whether the remarks were so grossly improper that the
 trial court committed reversible error by failing to
 intervene ex mero motu. In other words, the reviewing
 court must determine whether the argument in question
 strayed far enough from the parameters of propriety that
 the trial court, in order to protect the rights of the parties
 and the sanctity of the proceedings, should have intervened
 on its own accord and: (1) precluded other similar remarks
 from the offending attorney; and/or (2) instructed the jury
 to disregard the improper comments already made.

Jones, 355 N.C. at 133, 558 S.E.2d at 107 (citation omitted).

 First, defendant contends the State erred when it told the jury defendant could

be found to be the aggressor if he left the second floor of his house and went

 5
 STATE V. COPLEY

 ARROWOOD, J., dissenting

downstairs to the garage because this argument is contrary to State v. Kuhns, __ N.C.

App. __, 817 S.E.2d 828 (2018) and grossly prejudicial.

 Defendant does not quote the language he refers to as egregious, and only

provides a citation to a page in the transcript where the prosecutor discusses the

aggressor doctrine. Upon review of the transcript, it is clear the references to the

aggressor by the prosecutor in this portion of the transcript arose in the context of

self-defense, not the habitation defense:

 And I’m going to talk more about some of the things that
 he told you later, but what I want to get to is this excused
 killing by self-defense, okay?

 ....

 He doesn’t have to retreat from his home, but if you’re
 upstairs and somebody makes a show of force at you, it’s
 not retreating to stay upstairs. It’s, in fact, the opposite of
 that, right? But if you take your loaded shotgun and go
 down to the garage and if you buy him at his word, which I
 don’t know that you can, you are not retreating. You are
 being aggressive. You’re continuing your aggressive
 nature in that case.

(Emphasis added). Therefore, defendant’s argument that the trial court erred by

failing to intervene when the State misstated the law on the habitation defense is

without merit.

 Second, defendant argues the State incorrectly added exceptions to the

habitation defense that our statutes only permit as exceptions to self-defense.

 6
 STATE V. COPLEY

 ARROWOOD, J., dissenting

Defendant maintains the State committed this error in the following portion of its

argument:

 And I’m going to talk more about some of the things that
 he told you later, but what I want to get to is this excused
 killing by self-defense, okay?

 ....

 You can consider the size, age, strength of defendant as
 compared to the victim. . . . You’ve got somebody who’s
 standing at this point in a yard and you’ve got somebody
 on a second floor window. How much danger is he to him
 at that point? Especially at that point, he’s not even saying
 they’re pointing a gun at him. All they’ve done is this –
 (indicating) – if you buy him at his word.

 ....

 Reputation for violence, if any, of the victim, you didn’t
 hear that he was a violent guy. You didn’t hear that he was
 a gangbanger. All you heard is that he was actually the
 opposite of that, right?

(Emphasis added). I disagree. As with defendant’s first argument, this portion of the

transcript refers to self-defense, not the habitation defense. I would hold defendant’s

argument is without merit.

 II. Habitation Defense

 Next, defendant argues the trial court plainly erred by instructing the jury that

the habitation defense was not available if defendant was the aggressor.

 Defendant alleges plain error because he did not object on this basis at trial.

N.C.R. App. P. 10(a)(2), (a)(4) (2019). To demonstrate the trial court plainly erred,

 7
 STATE V. COPLEY

 ARROWOOD, J., dissenting

defendant “must show that the instructions were erroneous and that absent the

erroneous instructions, a jury probably would have returned a different verdict. The

error must be so fundamental that it denied the defendant a fair trial and quite

probably tilted the scales against him.” State v. Tirado, 358 N.C. 551, 574, 599 S.E.2d

515, 531-32 (2004) (citations and internal quotation marks omitted).

 Our statutes provide for the defense of habitation, in pertinent part, as follows:

 The lawful occupant of a home . . . is presumed to have held
 a reasonable fear of imminent death or serious bodily harm
 to himself or herself or another when using defensive force
 that is intended or likely to cause death or serious bodily
 harm to another if both of the following apply:

 (1) The person against whom the defensive force was used
 was in the process of unlawfully and forcefully entering,
 or had unlawfully and forcibly entered, a home . . . or if
 that person had removed or was attempting to remove
 another against that person’s will from the home. . . .

 (2) The person who uses defensive force knew or had reason
 to believe that an unlawful and forcible entry or
 unlawful and forcible act was occurring or had occurred.

N.C. Gen. Stat. § 14-51.2(b) (2017). Any “person who unlawfully and by force enters

or attempts to enter a person’s home . . . is presumed to be doing so with the intent

to commit an unlawful act involving force or violence.” Id. § 14-51.2(d).

 Distinct from the defense of habitation, the General Assembly set out the

requirements for self-defense in N.C. Gen. Stat. § 14-51.3 (2017). Both the defense of

habitation and self-defense are “not available to a person who used defensive force

 8
 STATE V. COPLEY

 ARROWOOD, J., dissenting

and who . . . [i]nitially provokes the use of force against himself or herself” unless

either of the following occur:

 a. The force used by the person who was provoked is so
 serious that the person using defensive force reasonably
 believes that he or she was in imminent danger of death
 or serious bodily harm, the person using defensive force
 had no reasonable means to retreat, and the use of force
 which is likely to cause death or serious bodily harm to
 the person who was provoked was the only way to
 escape the danger.

 b. The person who used defensive force withdraws, in good
 faith, from physical contact with the person who was
 provoked, and indicates clearly that he or she desires to
 withdraw and terminate the use of force, but the person
 who was provoked continues or resumes the use of force.

Id. § 14-51.4 (2017) (emphasis added).

 Here, the trial court instructed the jury in conformity with Pattern Jury

Instruction 308.80 of the North Carolina Pattern Jury Instructions, and included an

instruction on provocation that conformed with N.C. Gen. Stat. § 14-51.4 as follows:

 The State has the burden of proving from the
 evidence beyond a reasonable doubt that the defendant did
 not act in the lawful defense of the defendant’s home. The
 defendant is justified in using deadly force in this matter
 if, and there are four things. Number one, such force was
 being used to prevent the forcible entry into the
 defendant’s home, and, two, the defendant reasonably
 believed that the intruder would kill or inflict serious
 bodily harm to the defendant or others in the home, or
 intended to commit a felony in the home, and, three, the
 defendant reasonably believed that the degree of force the
 defendant used was necessary to prevent a forcible entry
 into the defendant’s home, and, four, the defendant did not

 9
 STATE V. COPLEY

 ARROWOOD, J., dissenting

 initially provoke the use of force against himself, or if the
 defendant did provoke the use of force, the force used by the
 person provoked was so serious that the defendant
 reasonably believed that he was in imminent danger of
 death or serious bodily harm, and the use of force likely to
 cause death or serious bodily harm to the person who was
 provoked was the only way to escape the danger.

(Emphasis added). Thus, the trial court did not reference defendant as an “aggressor”

while instructing on the defense of habitation. However, once the trial court

completed its instruction on the habitation defense, it referenced defendant as an

“aggressor” when it gave the self-defense instruction.

 The defendant would not be guilty of any murder or
 manslaughter if the defendant acted in self-defense and if
 the defendant was not the aggressor in provoking the fight
 and did not use excessive force under the circumstances.
 One enters a fight voluntarily if one uses towards one’s
 opponent abusive language, which, considering all of the
 circumstances, is calculated and intended to provoke a
 fight. If the defendant voluntarily and without provocation
 entered the fight, the defendant would be considered the
 aggressor unless the defendant thereafter attempted to
 abandon the fight and gave notice to the deceased that the
 defendant was doing so. In other words, a person who uses
 defensive force is justified if the person withdraws in good
 faith from physical contact with the person who was
 provoked and indicates clearly that he decides to withdraw
 and terminate the use of force but the person who was
 provoked continues or resumes the use of force. . . .

(Emphasis added).

 Defendant’s brief fails to identify the direct quotation or contested instruction

wherein the trial court instructed the defense of habitation is unavailable to an

 10
 STATE V. COPLEY

 ARROWOOD, J., dissenting

aggressor, and we have not found such an instruction. Instead, the trial court

instructed that the defense of habitation is unavailable to a defendant who initially

provokes the use of force against himself, and that self-defense is unavailable when a

defendant is an aggressor in provoking the fight. Thus, defendant’s argument

misconstrues the jury instructions.

 Nonetheless, defendant argues the jury would not have understood the

aggressor doctrine to be applicable to the habitation defense merely because the self-

defense instruction occurred after the habitation defense.

 I disagree and decline to conflate these defenses, as the statutory scheme of

our General Assembly and the decisions of this Court have distinguished the defense

of habitation and self-defense. Compare N.C. Gen. Stat. § 14-51.2 with N.C. Gen.

Stat. § 14-51.3; see State v. Roberson, 90 N.C. App. 219, 222, 368 S.E.2d 3, 6 (1988)

(distinguishing the rules of the defense of habitation from the rules of self-defense).

Moreover, although N.C. Gen. Stat. § 14-51.4 states that neither defense may be

utilized where a defendant provoked the use of force, our decisions have only referred

to a defendant’s status as an “aggressor” with regard to self-defense, and has never

applied this language to the defense of habitation.

 I also disagree that the jury would have confused these instructions, as our

Court must presume the jury “attend[s] closely the particular language of the trial

court’s instructions in a criminal case and strive[s] to understand, make sense of, and

 11
 STATE V. COPLEY

 ARROWOOD, J., dissenting

follow the instructions given them.” State v. Wirt, __ N.C. App. __, __, 822 S.E.2d 668,

674, 2018 WL 6613780, at *7 (2018) (citation and internal quotation marks omitted).

 To the extent defendant argues the court plainly erred in determining there

was sufficient evidence to instruct on provocation as an exception to the defense of

the home, I disagree.

 We review for plain error because defendant did not object on this basis at trial.

N.C.R. App. P. 10(a)(2), (a)(4). “Jury instructions must be supported by the evidence.

Conversely, all essential issues arising from the evidence require jury instructions.”

State v. Bagley, 183 N.C. App. 514, 524, 644 S.E.2d 615, 622 (2007) (citations and

internal quotation marks omitted). Therefore, to support an instruction on

provocation, the State must present evidence that the defendant provoked the use of

force.

 I would hold the State put forth sufficient evidence that defendant provoked

any force used against him where defendant himself testified he “escalated the

situation” by arming himself and yelling at the people who were “minding their own

business out in the street area.” Accordingly, I would hold defendant’s argument that

the jury instructions on the habitation defense constituted plain error is without

merit.

 III. Lying in Wait

 12
 STATE V. COPLEY

 ARROWOOD, J., dissenting

 Finally, defendant argues the trial court committed reversible error by

instructing the jury on the theory of lying in wait because the evidence did not support

the instruction.

 “[Arguments] challenging the trial court’s decisions regarding jury instructions

are reviewed de novo by this Court.” State v. Osorio, 196 N.C. App. 458, 466, 675

S.E.2d 144, 149 (2009) (citations omitted). “Where jury instructions are given without

supporting evidence, a new trial is required.” State v. Porter, 340 N.C. 320, 331, 457

S.E.2d 716, 721 (1995) (citation omitted). However, if “a request for instructions is

correct in law and supported by the evidence in the case, the court must give the

instruction in substance.” State v. Thompson, 328 N.C. 477, 489, 402 S.E.2d 386, 392

(1991).

 Our Supreme Court defines “first-degree murder perpetrated by means of lying

in wait” as “a killing where the assassin has stationed himself or is lying in ambush

for a private attack upon his victim.” State v. Leroux, 326 N.C. 368, 375, 390 S.E.2d

314, 320 (1990) (citations and internal quotation marks omitted). The perpetrator

must intentionally assault “the victim, proximately causing the victim’s death.” State

v. Grullon, 240 N.C. App. 55, 60, 770 S.E.2d 379, 383 (2015) (citation and internal

quotation marks omitted).

 Defendant argues the evidence does not support an instruction on first degree

murder by lying in wait because the evidence did not show he laid in wait to shoot a

 13
 STATE V. COPLEY

 ARROWOOD, J., dissenting

victim, but, rather, it shows he armed himself to protect his house from intruders

until police arrived to disperse the individuals gathered in front of his house. I

disagree.

 The State put forth sufficient evidence to support an instruction on lying in

wait, even assuming arguendo defendant offered evidence that suggests otherwise.

The State’s evidence shows defendant concealed himself in his darkened garage with

a shotgun, equipped with a suppression device. Defendant shot the victim, firing the

shotgun through the garage’s window. The shot bewildered bystanders because it

was unclear what happened, and defendant had not warned the crowd before firing

his weapon.

 This evidence supports the lying in wait instruction because it tends to show

defendant stationed himself, concealed and waiting, to shoot the victim, and this

action proximately caused the victim’s death. Accordingly, I would hold the trial

court did not err when it instructed the jury on murder by lying in wait.

 IV. Conclusion

 In conclusion, I must also note that, in addition to briefing an issue raised by

defendant, the majority also undertakes review of an issue at trial that was not raised

on appeal—whether the trial court erred because it used the pattern jury instruction

for the defense of habitation, which the majority avers does not define “home”

consistent with North Carolina law. Although the majority states that the pattern

 14
 STATE V. COPLEY

 ARROWOOD, J., dissenting

jury instruction should be reviewed and updated based on its analysis, I note that

this conclusion is dicta.

 For the forgoing reasons, I respectfully dissent.

 15